COMMONWEALTH *vs.* ROBERT J. PODLASKI.

Suffolk. November 7, 1978. — February 21, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Homicide. Constitutional Law,* Admissions and confessions. *Joint Enterprise. Practice, Criminal,* Instructions to jury.

Evidence at a murder trial that the defendant made an inculpatory statement to a policeman who had merely approached the defendant, asked him his name and whether he knew anything about a man who had been lying in the street was sufficient to warrant findings that the defendant was not in custody when he made his statement and that, therefore, Miranda warnings were not required. [342-434]

Evidence at a murder trial, including the nature of the injuries sustained by the victim and the defendant's statement, "I had to give it to him. I had to do him in," was sufficient to support a finding of premeditation. [345-346]

At a murder trial, evidence of the victim's extensive and serious injuries was sufficient to support a finding that the murder was committed with extreme atrocity or cruelty. [346-347]

To convict a defendant of murder with extreme atrocity or cruelty by means of participation in a joint venture, proof of malice is required but it is not necessary to show that the joint venturer intended that the murder be accomplished by atrocious or cruel means. [347]

At the trial of a defendant charged with murder with extreme atrocity or cruelty, there was no error in the denial of the defendant's request for instructions that the degree of the victim's suffering was a necessary consideration for the jury and its existence an indispensable element of the crime. [348-349]

Neither the fact that two others indicted for the same offense as the defendant were acquitted nor evidence as to the defendant's consumption of alcohol justified granting relief pursuant to G. L. c. 278, § 33E, to a defendant convicted of murder in the first degree. [349-351]

INDICTMENT found and returned in the Superior Court on July 15, 1977.

The case was tried before *Smith, J.*

*Daniel J. O'Connell, III,* for the defendant.

*William J. Doyle,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. We affirm the defendant's conviction of murder in the first degree and conclude that justice does not require the entry of a verdict of a lesser degree of guilt under G. L. c. 278, § 33E. The defendant's principal contention is that the evidence did not warrant submitting the case to the jury on the issue of murder in the first degree.

We summarize the evidence against the defendant. Shortly after 2 A.M. on May 3, 1977, Mr. and Mrs. Antonik of 43 Woodward Street, South Boston, were awakened by the noise of a slamming door. Mr. Antonik arose and heard a voice, coming from the direction of 40 Woodward Street, saying, "Kill him. Kill him." Mrs. Antonik went to a bedroom window and saw two men, later identified as Hughes and Barroni, dragging another man she did not know off the sidewalk in front of 40 Woodward Street. The defendant, whom she recognized, was accompanying Hughes and Barroni. They stopped momentarily. The defendant, who was wearing a pink shirt, bent over the victim and said, "Oh, shit, the bastard is dead." Hughes and Barroni dragged the victim down Woodward Street onto Leeds Street, with the defendant following closely behind him.

Mrs. Peltz, who lived at the corner of Woodward and Leeds Streets, was also awakened by noise shortly after 2 A.M. She saw the defendant following Hughes and Barroni as they dragged the victim onto Leeds Street and dropped him there. Hughes beat the victim several times with his fists and then kicked him a few times. Neither Mrs. Peltz nor the Antoniks saw the defendant touch the victim. When Mrs. Peltz cried out, "What are you doing?", the three men looked up and walked away quickly.

A few minutes later, Mr. Antonik watched the defendant, now shirtless, and the other two men enter 40 Woodward Street.

About 2:30 A.M., an ambulance arrived at Leeds Street. There was a pool of blood on the street near the victim's head. He had no pulse or blood pressure, but he was breathing "agonal breaths." The medical examiner testified that a person breathing in this fashion is still alive. At approximately 3 A.M., as the ambulance was leaving, Officer Zweihorn and his partner arrived. After speaking to Mrs. Antonik, they went to 40 Woodward Street. When they approached the front door, the first-floor lights went out. Their knocking brought no response. Officer Zweihorn conferred again with Mrs. Antonik, who told him about a back entrance. The officers went down an alley to the rear of 40 Woodward Street where they saw the defendant, wearing a blue shirt, standing on the top step of the cellar bulkhead. Officer Zweihorn asked the defendant his name and the defendant replied, "Robert Podlaski." He then asked whether the defendant knew anything about the man who had been lying in the street. The defendant replied, "The fellow called my mother a mother fucker and I had to give it to him. I had to do him in."[1] The officers placed the defendant in the police wagon. They entered the house and found Hughes and Barroni, and two other men who were apparently incapacitated by alcohol. All four of them were put in the wagon.

The house appeared to be abandoned. The rooms were in general disarray, littered with empty beer cans, wine bottles, and whiskey bottles. The police found no bloodstains in the house.

At the South Boston police station, Officer Zweihorn first noticed what appeared to be blood on the defendant's

---

[1] In the course of a voir dire on the admissibility of this statement, discussed below in section 1, Officer Zweihorn quoted the defendant in a slightly different form of words.

pants. Later, the defendant tried to wash his pants in the
toilet bowl in his cell. Tests showed traces of human blood
on the pants, on the soles of both shoes, and on the toe of
the right shoe.

The victim died as the result of fractures of the ribs and
a rupture of the vena cava, the large vein that carries
blood from the head to the aorta. The medical examiner
concluded that the victim could have lived for five to
fifteen minutes after the rupture. The rupture had to
have been caused by a "terrific belt." The victim was dead
on arrival at Boston City Hospital.[2]

The only evidence offered by the defense was the tes-
timony of a psychiatrist who examined the defendant six
days after the victim's death. He concluded that the de-
fendant was then suffering from delirium tremens or al-
cohol withdrawal syndrome, a condition that usually
starts forty-eight to seventy-two hours after one who had
been drinking consistently to the point of inebriation for
several years suddenly stops drinking.[3]

1. *Admissibility of Defendant's Statement.*

The judge properly denied the defendant's motion to
suppress his statement to Officer Zweihorn that "he had
to do [the victim] in, give it to him, and had to do him in
because he called him, called him and his mother a moth-
er fucker." The defendant contends this statement should

___

[2] The victim sustained numerous injuries. He had multiple abra-
sions and lacerations on the face, head, and neck; contusions of the
pelvic area and legs; a hemorrhage of the larynx; fractured ribs; blood
in the pleural cavities; fluid in the lungs; blood in the pericardial sac;
and fluid in the brain.

[3] Hughes and Barroni were tried together in a separate proceeding
and acquitted. Their trial was severed from the defendant's because
after his arrest the defendant had made a confession that tended to
exonerate the others. The defendant's confession was not offered
against him at his trial because the assistant district attorney had
serious doubts about its admissibility. Hughes and Barroni were inter-
ested in having that confession admitted in evidence at their trial;
hence, the severance. We were advised at oral argument that this
confession was admitted at their trial as a declaration against penal
interest under *Commonwealth* v. *Carr*, 373 Mass. 617 (1977).

have been suppressed because he was in custody at the time and had not been given Miranda warnings.[4]

The short answer to the defendant's argument that Miranda warnings should have been given is that, when he made the statement, he was not "in custody ... or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, 384 U.S. 436, 477 (1966). The questioning by Officer Zweihorn was a proper preliminary inquiry not requiring Miranda warnings. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 4-5 (1976), cert. denied, 429 U.S. 1049 (1977); *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977). The fact that the officer would not let the defendant leave until he had talked to him did not make the interrogation custodial. No suspicion had even focused on the defendant. "The questions were preliminary, directed to discovering ... what he knew about the circumstances." *Commonwealth* v. *Borodine*, *supra*. Unlike the situation in *Orozco* v. *Texas*, 394 U.S. 324 (1969), the officers did not question the defendant about incriminating facts without first informing him of his rights. Nor was this an overbearing, noncustodial interrogation. See *Beckwith* v. *United States*, 425 U.S. 341, 347 (1976). Before the defendant made his statement, Officer Zweihorn asked him only his name and whether he knew anything about the man who had been lying in the street.

2. *Sufficiency of the Evidence.*

The defendant next argues that the evidence was insufficient to warrant a finding of guilty of murder in the first degree. Although he does not explicitly so state in his

---

[4] The defendant now also argues that the statement was inadmissible because it was an involuntary confession. In the course of a voir dire on the admissibility of this statement, counsel for the defendant said at first that he might challenge the statement on the issue of voluntariness, but, at the conclusion of the voir dire, he indicated that he would not. The judge thus had no occasion to focus on, or to make findings concerning, the issue of voluntariness. The defendant may not raise an issue on appeal after waiving it at trial.

brief, we assume from his assignments of error that he bases this objection solely on the denial of his motion for a directed verdict "on so much of the indictment that alleges murder." In that form, the motion should have been denied if the evidence warranted a finding of murder in the second degree. The judge, however, was willing to treat the motion as including a request for a directed verdict on so much of the indictment as alleged murder in the first degree, and we shall do so as well.

The defendant argues that the case should not have been submitted to the jury on either the theory of deliberately premeditated murder or the theory of murder with extreme atrocity or cruelty. The motion for a directed verdict should have been denied unless the defendant was correct on both aspects of his argument.[5] Consequently, we need not reach all the defendant's contentions if there was any basis on which the case properly went to the jury concerning the defendant's guilt of murder in the first degree. However, because the ultimate result is not affected in any way and because, in any event, we must give some consideration to each issue in performing our duty under G. L. c. 278, § 33E, we shall treat the defendant's argument as properly directed toward each theory of murder in the first degree. In the same fashion, and for the same reasons, we shall consider the propriety of the submission of the case to the jury on the theory of joint venture.[6]

---

[5] If one, but not the other, theory justified submitting the question of murder in the first degree to the jury, the defendant's motion for a directed verdict could not preserve his appellate rights against submission of the case to the jury on the improper theory. Requests for instructions and objections to the judge's charge are the appropriate remedies in such an instance.

[6] Here, too, we stress that this is not properly a directed verdict issue on appeal, if there was any other basis on which the case could have been submitted to the jury. Rather curiously, the defendant argues before us that the case should not have been presented to the jury on the theory of joint venture, and yet he submitted requests for instructions concerning the circumstances of a joint venture, rather than

The principal thrust of the defendant's argument is that there was no evidence that he caused the victim's death and no evidence that he participated in the killing as a joint venturer. He argues that there was no direct evidence he struck the victim and that the fatal blow must have been struck by someone else while the victim was lying in the street. The evidence shows, he claims, only that he was present during the commission of the crime (see *Commonwealth* v. *Clark*, 363 Mass. 467, 473 [1973]; *Commonwealth* v. *Benders*, 361 Mass. 704, 708 [1972]) and not that he aided, assisted, or encouraged the others during its commission (see *Commonwealth* v. *Ambers*, 370 Mass. 835, 839 [1976]; *Commonwealth* v. *Perry*, 357 Mass. 149, 151 [1970]).

The evidence warranted the conclusion that the defendant was not merely an innocent bystander, but was guilty either as a joint venturer or as a principal. See *Commonwealth* v. *Scanlon*, 373 Mass. 11, 17-19 (1977); *Commonwealth* v. *Britt*, 358 Mass. 767, 769-770 (1971). Moreover, the evidence warranted such a finding on either of two theories of murder in the first degree.

a. *Premeditated murder.* The case properly went to the jury on the issue of deliberately premeditated murder. The defendant's statement, "I had to give it to him. I had to do him in," is sufficient to support a finding of premeditation by the defendant himself. The nature of the injuries sustained by the victim showed "a conscious and fixed purpose to kill continuing for a length of time and warranted a finding of murder with deliberately premeditated malice aforethought." *Commonwealth* v.

---

requesting an instruction that the evidence did not warrant a finding that the defendant was guilty on the basis of the conduct of Hughes or Barroni.

The defendant objects to the judge's failure to give requested instructions concerning joint venture. The judge was not required to instruct the jury in the precise language requested. *Commonwealth* v. *Martin*, 357 Mass. 190, 193-194 (1970). He adequately explained the law of joint venture in the instructions he did give.

*Satterfield,* 362 Mass. 78, 82 (1972), quoting from *Commonwealth* v. *Bonomi,* 335 Mass. 327, 356 (1957). See *Commonwealth* v. *Bartolini,* 299 Mass. 503, 515, cert. denied, 304 U.S. 565 (1938). Moreover, because there was evidence to justify a finding that the assailants acted jointly,[7] the words, "Kill him. Kill him," even if not uttered by the defendant, warranted a finding of premeditated murder if the jury concluded that those words were uttered by one of the assailants.

The question whether, due to intoxication, the defendant was not able to form a deliberately premeditated intention to kill was properly submitted to the jury. See *Commonwealth* v. *Johnson,* 374 Mass. 453, 461-462 (1978); *Commonwealth* v. *Satterfield, supra.* There was evidence from which the jury could have concluded that the defendant was not too drunk to premeditate. Among that evidence was the defendant's flight when Mrs. Peltz asked, "What are you doing?"; his changing his shirt; his exit from the basement of the house after the police knocked on the front door; and his conversation with the police.

b. *Murder with extreme atrocity or cruelty.* The evidence also warranted submitting the case to the jury on the issue of murder with extreme atrocity or cruelty. The victim's extensive and serious injuries certainly warranted a finding that whoever participated in the beating of the victim did so with extreme atrocity or cruelty. See *Commonwealth* v. *Lacy,* 371 Mass. 363, 368 (1976); *Commonwealth* v. *Satterfield,* 362 Mass. 78, 81-82 (1972); *Commonwealth* v. *McGarty,* 323 Mass. 435, 440 (1948). For the

[7] Among the evidence that would support the conclusion that the defendant was knowingly involved in the beating are: (a) his statement to the police, (b) his association with Hughes and Barroni in the house before the beating and while they were dragging the victim, (c) the blood on his shoes and pants, (d) his changing his shirt, (e) his attempt to wash the blood off his pants, (f) his statement on the street, "Oh, shit, the bastard is dead," and (g) his act of fleeing when Mrs. Peltz yelled, "What are you doing?"

reasons already indicated, there was evidence to warrant a finding that the defendant himself inflicted the victim's injuries and, additionally or alternatively, a finding that the defendant participated in a joint venture to inflict those injuries. Intoxication is not a mitigating factor in the case of murder with extreme atrocity or cruelty. *Commonwealth* v. *Appleby*, 358 Mass. 407, 415-416 (1970).

c. *Joint venture.* We reject the defendant's contention that a person cannot be guilty of murder with extreme atrocity or cruelty by means of participation in a joint venture. To be guilty on a joint venture theory, a defendant must share the intent of the principal (*Commonwealth* v. *Scanlon*, 373 Mass. 11, 17 [1977]), but, as to this type of murder in the first degree, even the principal need not have an intention to use atrocious or cruel means or indeed know that the particular conduct constitutes atrocity or cruelty. See *Commonwealth* v. *Golston*, 373 Mass. 249, 259-260 (1977), cert. denied, 434 U.S. 1039 (1978); *Commonwealth* v. *Satterfield*, 362 Mass. 78, 81 (1972); *Commonwealth* v. *Appleby*, 358 Mass. 407, 415 (1970). There is, of course, as in any murder conviction, a requirement of the proof of malice (*Commonwealth* v. *Gilbert*, 165 Mass. 45, 59 [1895]), that is, an intent to inflict an unlawful injury (*Commonwealth* v. *McInerney*, 373 Mass. 136, 140 [1977], and cases cited). A joint venturer need only intend that the victim be killed or know that there is a substantial likelihood of the victim's being killed. *Commonwealth* v. *Scanlon*, 373 Mass. 11, 17 (1977). If the joint venturer has this intent and participates in a killing accomplished by means of extreme atrocity or cruelty, he is guilty of murder in the first degree. Consequently, the jury would have been warranted in finding that the defendant was guilty of murder with extreme atrocity or cruelty either by his own acts or by participating in a joint venture to inflict injuries on the victim.

3. *Instructions on Murder with Extreme Atrocity or Cruelty.*

The judge did not err in declining to give the defendant's requested instruction that in determining the degree of atrocity or cruelty, "it is necessary to consider the consciousness and degree of suffering of the victim."[8] At the conclusion of the jury charge, counsel for the defendant renewed the subject in a somewhat different form by asking the judge to charge the jury that they could not consider extreme atrocity or cruelty unless they found that the victim was conscious during part of the suffering or beating.

Although there have been cases where the conscious suffering of the victim was considered significant (*Commonwealth* v. *Clifford,* 374 Mass. 293, 307-308 [1978]; *Commonwealth* v. *Lacy,* 371 Mass. 363, 367 [1976]), such suffering has never been an indispensable element of the crime of murder with extreme atrocity or cruelty. See *Commonwealth* v. *Golston,* 373 Mass. 249, 259-260 (1977) (citing cases involving death from a single blow); *Commonwealth* v. *Satterfield,* 362 Mass. 78 (1972) (kicking the victim to death; no evidence of the victim's consciousness); *Commonwealth* v. *Bartolini,* 299 Mass. 503, 515-516 (1938) (violent blows to living, but possibly unconscious, victim). The statutory reference is to "atrocity or cruelty" in the disjunctive. G.L. c. 265, § 1. Even if "cruelty" implies suffering on the victim's part, "atrocity" does not. Consequently, the defendant's requests for instructions that the degree of the victim's suffering was a necessary consideration for the jury, and its existence an indispensable element of the crime, were properly denied.

---

[8] The defendant requested the following instruction: "To determine the degree of atrocity or cruelty, *it is necessary to consider the consciousness and degree of suffering of the victim*; the disproportion between the means needed to inflict death and those employed; the instrumentalities employed; and the extent of the physical injuries" (emphasis supplied).

The judge referred explicitly to the other elements stated in the requested instruction.

If the defendant had requested the judge to instruct the jury that the victim's consciousness and suffering were relevant subjects for consideration, a different question would have been presented. The importance of a particular factor bearing on the possibility of extreme atrocity or cruelty varies from case to case. Here, although the victim presumably was conscious at least when the first blow was struck, the evidence presents no picture of the victim's consciousness or suffering. The Commonwealth, therefore, had to prove its case by relying on other factors. The judge's charge fairly focused on the evidence that was before the jury. "[I]n the final analysis, the issue must be left largely to the deliberation of the jury" to "determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty." *Commonwealth* v. *Lacy*, 371 Mass. 363, 367-368 (1976), quoting from *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970).

4. *Relief under § 33E.*.

The defendant argues that we should grant him relief under G. L. c. 278, § 33E. Our consideration of the errors claimed to have been committed at his trial discloses no reason for granting a new trial. The question whether we should order the entry of a verdict of a lesser degree of guilt merits some attention.

The defendant acknowledges that the verdicts of acquittal obtained by Hughes and Barroni cannot alone justify relief under G. L. c. 278, § 33E. See *Commonwealth* v. *Pisa*, 372 Mass. 590, 597 cert. denied, 434 U.S. 869 (1977); *Commonwealth* v. *DeChristoforo*, 371 Mass. 26, 39-40 (1976). Not only may the evidence be different in one trial from the other, but we normally do not have both records before us to make any comparison. See *Commonwealth* v. *Simpson*, 370 Mass. 119, 126-127 (1976); *Commonwealth* v. *Williams*, 364 Mass. 145, 151 (1973). In other instances, we have been able to make a reasonable assessment of the relative conduct of two individuals and, on at least one occasion, we have concluded that justice

requires a reduction in a sentence to achieve equity in the sentencing process. See *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 750 (1975). Cf. *Commonwealth* v. *Pisa*, *supra*.

It is difficult to make any comparison between the treatment accorded Hughes and Barroni and that accorded the defendant. We do know, however, from the transcript of a pretrial hearing, that the defendant told a detective that Hughes and Barroni "never touched" the victim. The prosecutor did not offer this statement as evidence at Podlaski's trial because he was not convinced Miranda requirements had been met. We learned at oral argument that the statement did come to the attention of the jury in the trial of Hughes and Barroni. See note 3 *supra*. Certainly, justice does not require a reduction in the defendant's sentence because his acknowledgment of guilt, not admissible against him at his own trial, was brought forth at the trial of Hughes and Barroni. Nor do we see § 33E as designed to benefit a criminal defendant because one or more of his accomplices were exonerated when perhaps they should not have been.

The defendant argues that his consumption of alcohol just prior to the killing is of special relevance to our analysis under § 33E because he was an alcoholic. A defendant's state of intoxication has been a factor in certain of our decisions ordering a reduction in a verdict. See *Commonwealth* v. *King*, 374 Mass. 501, 507 (1978); *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 749 (1975). The facts of the case before us are not similarly persuasive. Here, the question of the defendant's capacity for deliberate premeditation in spite of his consumption of alcohol was submitted to the jury and decided against him. Contrast *Commonwealth* v. *King, supra.* The evidence in support of deliberate premeditation is not sketchy (contrast *Commonwealth* v. *Cadwell*, 373 Mass. 308, 316 [1978]); it indicates that the defendant was capable of exercising rational judgment immediately after the beating. Death was not the result of fleeting violence (contrast *Common-*

*wealth* v. *Cadwell, supra; Commonwealth* v. *Williams,* 364 Mass. 145, 152 [1973]), or of a sudden, violent, and unexpected act by a person other than the defendant (contrast *Commonwealth* v. *Vanderpool, supra* at 750). Rather, death came after the defendant (and others) engaged in a senseless beating of the victim over a considerable period of time. A reduction in the defendant's sentence is not justified.

*Judgment affirmed.*