## COMMONWEALTH vs. MILTON L. RICE.

Barnstable. March 3, 1998. - April 8, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & MARSHALL, JJ.

*Jury and Jurors. Practice, Criminal,* Examination of jurors, Argument by prosecutor, Instructions to jury, Admissions and confessions, Assistance of counsel, Capital case. *Homicide. Intent. Malice. Evidence,* Consciousness of guilt, Admissions and confessions. *Constitutional Law,* Admissions and confessions.

A trial judge properly denied, without an evidentiary hearing, a criminal defendant's motion for a new trial based on alleged bias that a juror had improperly failed to disclose, where the defendant, who had actively participated in the jury selection process, failed to demonstrate that the juror in question was actually biased or that the juror dishonestly answered a material question on voir dire. [207-208]

At a criminal trial, comments in the prosecutor's closing argument, based on the evidence, regarding the behavior of the victim during the murder and the state of the victim's remains were not improper. [208-209]

At the trial of an indictment for murder in the first degree, the judge correctly instructed the jury on their use of the defendant's conduct after the murder in their consideration of deliberate premeditation and malice aforethought [209-211]; further, the absence of a consciousness of guilt instruction did not create a substantial likelihood of a miscarriage of justice [211].

A criminal defendant failed to demonstrate that the trial judge erred in denying the defendant's motion to suppress his statements to the police, or that the defendant was deprived of effective assistance of counsel. [211-212]

No reason appeared on the record of a murder trial for this court to exercise its authority under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. [212-213]

INDICTMENTS found and returned in the Superior Court Department on August 24, 1993.

The cases were tried before *Robert A. Mulligan,* J., and a motion for a new trial was heard by him.

*Richard J. Shea* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury convicted the defendant of murder in the

first degree by reason of deliberate premeditation and extreme atrocity or cruelty and of assault and battery by means of a dangerous weapon. The victim was the defendant's wife. The judge subsequently considered, and in a written decision denied, the defendant's motion for a new trial. The defendant has appealed from the judgments of conviction and the order denying his motion for a new trial. The defendant's appellate counsel, who was not his trial counsel, raises issues as to possible juror bias, statements in the prosecutor's closing argument, certain jury instructions, the denial of the defendant's motion to suppress his statements to the police, and the effectiveness of the representation provided by the defendant's trial counsel.[1] We discern no basis on which to disturb the jury's verdicts or the order denying the motion for a new trial. We also discern no basis to grant the defendant relief under G. L. c. 278, § 33E. Accordingly, we affirm the judgments of conviction and the order denying the motion for a new trial.

We summarize the evidence before the jury. On August 4, 1993, at approximately 5:50 A.M., police officers responded to a report of a car fire on Parker Road in West Barnstable. The car was off the road and contained the charred remains of a body in the front seat. After learning that the car was registered to Milton L. Rice of 120 Buttonwood Lane in West Barnstable, the police proceeded to that address and observed the defendant walking toward them from a wooded pond area behind the house. The police told the defendant that his car had been "in a very serious motor vehicle accident. Somebody had been deceased." He was asked who could have had access to the car. The defendant went inside the house, ostensibly to determine if the victim was at home, and on his return, stated that she was gone and that her bedroom "was a mess." After obtaining the defendant's permission to enter the house, two police officers went upstairs to the second-floor bedroom and observed blood on the bedroom furniture, floor, carpet, walls, and ceiling. The police officers went back outside and informed the defendant of his Miranda rights. The defendant waived his rights, and also

---

[1]These last two issues, concerning the motion to suppress and the effectiveness of the defendant's trial counsel (the defendant was represented by two lawyers), are argued by the defendant's appellate counsel under the standards set forth in *Commonwealth* v. *Moffett*, 383 Mass. 201, 216-217 (1981). The defendant has also filed a pro se brief in support of his position on these two issues, which we have considered.

signed a consent form for the search of his home. After being informed of his rights a second time, the defendant stated, "My life is over. I screwed up big time. I had a divorce all worked out. She wouldn't go along with it. I hit her with a club. I punched her. I threw her in the car, staged an accident. What's going to happen to me? What's going to happen to my son . . . ? I'm an embarrassment to all my friends."

The defendant was taken to the police station, where, after once again waiving his Miranda rights, he gave a detailed confession. The defendant recounted that he and the victim had gone out to dinner the previous evening at a local restaurant. Although the dinner was cordial, the couple had, in fact, been discussing divorce for several months. The defendant had drafted a separation agreement some months before the murder, by which he was to remain in the marital home with physical custody of their son. The victim was to retain a twenty per cent ownership interest in the home.

The couple returned home from dinner at about 10:30 P.M., and, after watching some television, the couple began discussing the settlement agreement. The victim expressed reluctance to go along with the agreement, stating that she wanted the house and custody of their son. An argument ensued, after which the victim went upstairs to the master bedroom at approximately 11:30 P.M. The defendant followed her to the bedroom, and then, according to his statement, "snapped," striking her with a club when she was sitting on the bed and looking the other way. She screamed and fought back, hitting him across the bridge of his nose and scratching his eyes. They fell to the floor and continued to struggle. The defendant stated that he hit her with the club seven times, then dropped the club and punched her with his fist. The defendant did not know how long they struggled, but stated that the victim "would not give up." At some point, she stopped moving.

The defendant realized that there was blood everywhere and that he had to clean it up. He carried the victim downstairs and placed her in the front passenger seat of their car, then returned to clean up the blood. After a few attempts to wipe down the walls, he abandoned the cleanup and instead tried to disguise the blood by pouring red wine on the stains.

At approximately 4:15 A.M., the defendant drove the car containing the victim's body to Parker Road, which was located approximately one-quarter mile from his house. He caused the

car to run off the road in an attempt to make it look like the victim's injuries had been the result of a car accident. The defendant stated that he knew the accident was not severe enough to have caused her injuries, but left the car and went home.

After returning home, the defendant gathered items that had too much blood on them to be cleaned, including a pillow and pillow case, a sheet, books, and a latex glove, and placed them in a plastic trash bag with a brick. He threw the bag, along with the sneakers that he had been wearing at the time of the murder, into the pond behind his house. The police later recovered these items from the pond. The defendant also described the murder weapon as a piece of wood, two inches by three inches and approximately two feet long, that he had ripped from a larger piece of wood. The "club" was rounded on one edge and square on the other three edges. This club, which was stained with human blood but revealed no fingerprints, was later found in the bushes to one side of Buttonwood Lane in the approximate location identified by the defendant. Two fragments of cortical bone, consistent with bone from a skull, were recovered from the club.

Other testimony tended to corroborate the defendant's admissions. Several witnesses testified to having seen the couple at the restaurant on the evening of August 3, 1993, and that neither the defendant nor the victim seemed upset or intoxicated. A neighbor testified that she heard loud noises, "like fighting," coming from the defendant's house at approximately 11:30 P.M., and lasting for approximately one-half hour. Another witness testified that he saw a car leaving the driveway at 120 Buttonwood Lane at approximately 4:10 A.M. on the morning of August 4, 1993. The Commonwealth's expert on blood evidence testified that the amount, locations, and splatter patterns of the blood in the bedroom were indicative of at least two medium velocity blows, consistent with those caused by a fist or a blunt instrument. Although the victim's body suffered widespread thermal injury from the fire, no soot was found in her airways or lungs, indicating she had been dead before the fire started. Her airways did, however, contain blood, which was indicative of head trauma prior to death. The medical examiner testified that it was unlikely someone could have died from head trauma due to the car accident, given the minimal amount of damage to the car. The defendant had been conducting an affair with a

woman whom he wished to marry. During the summer of 1993 this woman had been incarcerated, but was due to be released, and anticipated that she would live with the defendant at 120 Buttonwood Lane.

The defendant testified on his own behalf. His testimony also tended to corroborate many of his statements to the police, but differed in certain aspects. He testified that the reason he went into the victim's bedroom after she went upstairs was to set the central alarm system. He sat down next to her on the bed, and when he tried to continue the conversation about the separation agreement, the victim said, "Why don't you just get on your fucking motorcycle and get the hell out of here." The defendant stated that, in response to those words, he "lost it." He picked up a stick that was on the floor by the bed and started hitting her in an uncontrollable rage. The next thing he remembered was "waking up [as if] from a bad dream," with the victim dead beneath him. On cross-examination, the defendant admitted that he had not told the police that he had "woke[n] up from a bad dream straddling [the victim's] body." The defendant admitted that he had lied to the police when they first arrived, admitted that he tried to cover up the crime, and conceded that he had written several letters to the woman with whom he was having an affair. One letter, dated August 3, had told her that he "love[d] her more than anything on this planet."

1. The defendant claims that the judge erred in denying his motion for a new trial (and in refusing to conduct an evidentiary hearing), because he made a reasonable showing that a juror had engaged in misconduct by not disclosing, during voir dire of the jury venire, that, as a student, he had had a hostile relationship with the defendant when the defendant taught at Barnstable High School in the mid-1980's. The judge had broad discretion to rule on the contention in the defendant's postconviction motion and his supporting affidavits without resort to an evidentiary hearing, especially because the judge had also presided at the trial. See *Commonwealth* v. *Amirault*, 424 Mass. 618, 646 (1997). The defendant would be entitled to relief on his motion only if it could be shown that "a juror was actually biased because the juror dishonestly answered a material question on voir dire and that prejudice resulted from the dishonesty." *Commonwealth* v. *Amirault*, 399 Mass. 617, 625 (1987). Similarly, an evidentiary hearing would have been required only if the defendant had demonstrated a sufficient basis for concluding that this standard could be met. See *id.* at 626-628.

The judge acted within his discretion in rejecting, as simply not credible, the defendant's affidavits, filed nearly two years after the trial ended. The affidavits asserted that the juror had been his student, that hostility had existed between the defendant and the juror, and that the defendant had not remembered the juror until he had been able to "reflect" while in prison after his convictions. During the voir dire of the jury venire, the defendant had actively participated in the selection of jurors. At the conclusion of the empanelment, the judge made an express finding that "throughout empanelment [the defendant] conferred on almost each occasion that someone was called to the jury box. He conferred with counsel and was actively involved in the decision relative to challenging those persons who were challenged." The defendant thus had ample opportunity during the voir dire and the trial to voice whatever concern he may have had with respect to any possible juror bias.

In addition, the juror (along with several other prospective jurors) was individually questioned by the judge during the voir dire about his knowledge of the defendant. The juror stated that he knew of the defendant because he had been a student at Barnstable High School when the defendant had taught there. The judge specifically asked the juror whether that fact would affect his decision-making process, and the juror answered, "No." The juror also answered in the negative when the judge asked whether the juror had "any feelings one way or another, any disposition one way or another about [the defendant] in any way." The defendant's trial counsel made no objection to, or comment about, the juror's responses, and the defense did not use a peremptory challenge to remove the juror from the panel. This acquiescence is to be viewed in light of the judge's finding, set forth above, about the defendant's active participation in the jury selection process. There is nothing to show that the juror was dishonest in his responses to the judge's questions or that any reason existed for the judge to question the juror's declarations of impartiality. See *Commonwealth* v. *Bianco*, 388 Mass. 358, 368, *S.C.*, 390 Mass. 254 (1983) (trial judge entitled to accept, without more, juror's declaration of disinterest). The defendant has provided no basis, other than his self-serving assertions, that the juror was, in fact, his student, or that the juror took his place in the jury box with a bias against the defendant.

2. The defendant argues, for the first time on appeal, that statements in the prosecutor's closing argument prejudiced the

jury's impartial consideration of the issue of extreme atrocity or cruelty. The specific remarks now criticized are the prosecutor's references to the victim's screaming as the defendant continued to hit her with the club. The statements were made in the context of the prosecutor's discussion of the factors set forth in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), for the jury's evaluation of the evidence pertaining to extreme atrocity or cruelty, particularly the assertion that the defendant was indifferent to the victim's suffering. We discern no error.

The defendant himself told the police that the victim had screamed after he struck the first blow, and that she had struggled while he struck her several times with the club. The copious amount of blood present in the bedroom demonstrated that the victim died after an extremely violent attack. Despite some tendency to hyperbole, the prosecutor's statement that "she screamed and she screamed and then she died," was a reasonable inference from the evidence and did not unfairly play on the sympathies of the jury. See *Commonwealth* v. *Johnson*, 425 Mass. 609, 612 (1997).

The defendant also questions, for the first time, the prosecutor's references to the victim's charred remains after the staged car accident. The prosecutor's statements were confined to the facts in evidence. In addition, the judge carefully instructed the jury not to consider the destruction of the victim's body in connection with the issue of extreme atrocity or cruelty. There is nothing in these remarks that constitutes prosecutorial misconduct.

3. There was no error in the jury instructions concerning deliberate premeditation, malice, and consciousness of guilt.

(a) During his instructions on deliberate premeditation, the judge told the jury:

> "You may not use, you cannot use evidence of the Defendant's actions after the death of . . . his wife. When I say his actions, I mean his actions in cleaning up or staging an automobile accident or disposing of items. You may not use that as evidence of deliberate premeditation unless you are convinced beyond a reasonable doubt that he made those plans prior to killing his wife."

This instruction is essentially the same as that requested in writing by the defendant's trial counsel, and there was no objection

made to the instruction. The defendant now argues that the instruction improperly invited the jury to use the evidence of his postkilling conduct to speculate as to whether the killing had been planned. The judge's instruction was a correct statement of the law, see *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978), and, contrary to the defendant's assertions, emphasized to the jury that evidence of deliberate premeditation had to be strictly confined to the defendant's actions prior to the killing, unless the jury concluded, beyond a reasonable doubt, that the defendant had formulated his plan to make the killing appear to be accidental before the murder took place. The evidence warranted the inference that, after the victim rejected the divorce settlement, thereby disrupting the defendant's goal of terminating the marriage so he could live with his paramour, the defendant reflected for at least some brief period and decided to kill his wife and to conceal the crime.

(b) After completion of his initial jury charge, the judge gave a supplemental instruction, at the prosecutor's request, that the jury could consider the defendant's attempts to conceal the murder in deciding whether "[the defendant] had the capacity to form the required intent for malice aforethought," and whether he had the ability "to think and to reflect and to act." The defendant raised the issue of his state of mind when he testified that, at the time of the killing, he was "out of . . . control" with no "conscious thoughts." Postkilling conduct by a defendant may be relevant to a defendant's state of mind at the time of the killing, and it is for the jury to determine the weight to be given to that conduct on the issue of malice. Cf. *Commonwealth* v. *Podlaski*, 377 Mass. 339, 346 (1979) (defendant's postkilling activities to evade apprehension relevant to show defendant not too intoxicated to premeditate).

There was sufficient evidence to warrant a finding by the jury of malice. The defendant told the police that he struck his wife several times with a club and his fist during a violent struggle. Intentional use of a dangerous weapon may permit a jury to infer malice. See *Commonwealth* v. *Albert*, 391 Mass. 853, 860-861 (1984), and cases cited. Although the defendant testified that the club just happened to be lying on the bedroom floor, the jury could have inferred from the evidence that the defendant brought the club upstairs with him from a pile of similar boards located behind the house. The only indication that the defendant may have acted without malice was his own self-serving

testimony, which the jury rejected. The supplemental instruction had a foundation in the evidence, and was pertinent to the jury's consideration of malice as well as to the defendant's claim that he had acted unintentionally.

(c) The defendant's trial counsel requested that the jury not be instructed on the issue of consciousness of guilt under the then applicable decision of *Commonwealth* v. *Cruz,* 416 Mass. 27, 29-31 (1993), and the judge granted that request.[2] After the jury instructions were completed, the defendant's trial counsel stated, in response to a question by the judge, that he and the defendant were "eminently satisfied with what you [the judge] have done" concerning the issue of consciousness of guilt. There is no merit to the defendant's argument that the absence of a consciousness of guilt instruction created a substantial likelihood of a miscarriage of justice.

4. We reject the remaining contentions raised by the defendant.

(a) The judge did not err in denying, after an evidentiary hearing, the defendant's motion to suppress his statements to the police. The defendant was informed of, and waived, his Miranda rights both before giving his statements at his home and at the police station. However, the defendant contends that, on two separate occasions, he asked the police whether he should be speaking to an attorney. The judge heard testimony from two police officers that the defendant never asked for an attorney, but rather, asked whether he should be speaking to someone from the district attorney's office. This question was asked in the context of the defendant's inquiries about what would happen to him. The judge was warranted in finding that

---

[2]As we stated in *Commonwealth* v. *Simmons,* 419 Mass. 426, 435-436 (1995) (decided after this trial):

"A defense attorney . . . as matter of trial tactics, might not want to request a consciousness of guilt charge if none is requested by the Commonwealth or given, sua sponte, by the judge. Defense counsel might feel that it would not assist the defendant's case to have the judge focus the jury's attention on such matters as flight or concealment, even with cautionary language on how the evidence is to be weighed. Counsel at the trial might wish only to discuss evidence suggesting consciousness of guilt in closing arguments or simply to leave it for the jury's reflection unadorned by comment either by them or the judge."

the police did not consider the defendant's question to be an invocation of his right to counsel, but rather an effort by the defendant to clarify what penalty he might face as a result of the crime. (In response to the inquiry, the defendant was advised that the State police officer who was present represented the district attorney's office and had the authority to speak for that office.) The record also supports the judge's findings and conclusions that the defendant made his statements voluntarily after a knowing and intelligent waiver of his Miranda rights.

(b) The defendant claims that he was deprived of effective assistance of counsel through multiple errors and omissions of his trial counsel.[3] We have examined these claims, asking whether anything done, or not done, by the defendant's trial counsel may have created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

At the close of the trial, the judge stated on the record that "the defendant was very ably represented throughout this trial," and that "it was a very well-tried case" by both sides. We reach the same conclusion after reviewing the record. Several issues raised by the defendant as suggesting inadequate representation have previously been discussed and rejected. Other issues appear to involve matters of trial strategy. None of the criticized conduct could have resulted in a substantial likelihood of a miscarriage of justice. See *Breese* v. *Commonwealth*, 415 Mass. 249, 251 (1993).

5. There is no basis under G. L. c. 278, § 33E, for a reduction in the murder verdict or the grant of a new trial. The jury obviously disbelieved the defendant's version of the killing, and they rejected possible verdicts of murder in the second degree or manslaughter. The defendant's attack on the victim constituted a brutal killing. The Commonwealth's evidence was sufficient

---

[3]The defendant asserts ineptness in his trial counsel's failing to exercise all peremptory challenges; failing to raise the issue of the voluntariness of his statements to police before the jury; concealing his injuries, allegedly received during the struggle with the victim, from the jury; failing to object to statements made by the prosecutor during trial and closing argument; conceding guilt during closing argument; failing to object to the judge's instructions on malice; requesting that the judge not give a consciousness of guilt instruction; and in the failure by one of his trial attorneys to excuse himself from the case when, in the defendant's opinion, he became seriously ill and could no longer provide effective counsel.

to justify findings by the jury (which they made) on both theories of murder in the first degree.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*