## Commonwealth *vs.* Sokphann Chhim.

Middlesex. May 5, 2006. - August 2, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Practice, Criminal,* Required finding, Postconviction relief, Lesser included offense. *Joint Enterprise. Evidence,* Joint enterprise.

The evidence at a criminal trial was sufficient to convict the defendant of murder in the first degree on a theory of extreme atrocity or cruelty as a joint venturer, where the jury could have inferred from the fact that the defendant remained at the scene during the brutal beating of the victim that the defendant kept himself in a position ready and able to help the other attackers, and that he was willing and available to assist in the getaway of the joint venturers after the beating ended; moreover, the evidence warranted a finding that the murder was committed with extreme atrocity or cruelty, and the vicious beating of the victim by the several assailants created an inference of intent to do grievous bodily harm or to do an act which would create a plain and strong likelihood of death. [376-380]

At a criminal trial, the judge did not abuse his discretion in reducing a verdict of murder in the first degree to manslaughter, despite the presence of sufficient evidence to support the jury's verdict, where the evidence, in the light most favorable to the Commonwealth, showed that the defendant, after becoming aware that a fistfight was escalating, remained in an automobile and then fled the scene, at most clearing the lane of traffic so that his joint venturers could depart freely in another vehicle; and where the judge properly considered the overall weight of the evidence, concluding that no matter which version of the events was accepted, the defendant's role in the victim's death was so minimal that justice would not be served by a conviction of murder in the first degree. [380-384] Spina, J., dissenting, with whom Greaney and Ireland, JJ., joined.

Indictment found and returned in the Superior Court Department on September 6, 2001.

A pretrial motion to suppress evidence was heard by *Paul A. Chernoff,* J.; the case was tried before *Ralph D. Gants,* J., and motions for postconviction relief and for a new trial were heard by him.

The Supreme Judicial Court granted an application for direct appellate review.

*Stewart T. Graham, Jr.,* for the defendant.

*Peter A. D'Angelo,* Assistant District Attorney (*Kevin L. Ryle,* Assistant District Attorney, with him) for the Commonwealth.

COWIN, J. The defendant, Sokphann Chhim, was convicted of murder in the first degree of Karlos Dowdye and larceny of a motor vehicle. After conviction, on the defendant's motion pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), the judge reduced the finding of guilty on the indictment for murder in the first degree and ordered that a finding of guilty be entered on the lesser included charge of "involuntary manslaughter — battery." The judge allowed the motion on the ground that such a verdict is "more consonant with justice." See *id.; Commonwealth* v. *Gaulden,* 383 Mass. 543, 555-556 (1981). At the same time, the judge denied the defendant's renewed motion for a required finding of not guilty. The Commonwealth appealed the order reducing the verdict and the defendant appealed the denial of his motion for a required finding of not guilty.

We recite the convoluted procedural history of the case. Prior to trial, the defendant filed a motion to suppress letters he had written which were intercepted while he was incarcerated awaiting trial. The motion was denied. Trial proceeded before a different judge (the judge) who, at the close of the Commonwealth's case, allowed the defendant's motion for a required finding of not guilty on so much of the murder indictment as charged murder in the first degree on a theory of deliberate premeditation, but denied the motion as to so much of the indictment as charged murder in the first degree on a theory of extreme atrocity or cruelty.[1] The defendant's renewed motion for a required finding of not guilty at the close of all the evidence was denied. After conviction, the defendant filed a timely notice of appeal. As stated, the defendant then filed a rule 25 (b) (2) motion, seeking reduction of the murder verdict, and the judge reduced the verdict to manslaughter. The Commonwealth appealed from the judge's order reducing the verdict. The defendant filed a motion for a new trial, which was denied, and the defendant appealed the denial of the motion. The

---

[1]The motion for a required finding was denied as to the larceny indictment.

defendant's appeals from his conviction[2] and from the denial of his motion for a new trial were consolidated with the Commonwealth's appeal from the allowance of the rule 25 (b) (2) motion. In his direct appeal, the defendant raises several issues related to the denial of his motion to suppress and also contends that his motion for a required finding of not guilty on the indictment of murder in the first degree on a theory of extreme atrocity or cruelty should have been allowed. His appeal from the order denying his motion for a new trial raises questions concerning the denial of his motion to suppress.[3] We granted the Commonwealth's petition for direct appellate review and affirm the judge's denial of the motion for a required finding of not guilty and his order allowing reduction of the verdict to manslaughter.[4]

1. *Facts.* We recite the facts in some detail, as the issues with which we are concerned involve the quantum of evidence. Because the key question is the defendant's role in the events, we emphasize the facts that concern his actions. This case involves a fight in Lowell on the late night or early morning of July 13 and 14, 2001, in which the victim was stabbed and beaten to death. It appears that the killing emanated from the fact that the victim's car blocked the route of the automobile in which the defendant was a passenger.

At about 11:45 P.M. on July 13, the defendant was in a Cadillac automobile driven by Pov Hour. Also in the car were Bol Choeurn, Thol Leang, Kimthy Un, a "skinny guy" who was asleep in the back seat during the entire incident, and Oahn Tran, a young woman who was acquainted with all the people in the car except the one who slept through the incident. As the

---

[2]No argument is made before us regarding the larceny conviction.

[3]Both at oral argument and in a postargument letter, the defendant advised the court that, should we affirm the allowance of the rule 25 (b) (2) motion and affirm the denial of his motion for a required finding of not guilty, he would waive his appeal from the denial of his motion to suppress and the denial of his motion for a new trial. In other words, if we do not decide that his motion for a required finding of not guilty should have been allowed, the defendant does not want a new trial and is content with the reduction of the verdict to manslaughter.

[4]In view of our holding, we need not consider the defendant's contentions regarding his motion to suppress and motion for a new trial. See note 3, *supra.*

Cadillac drove up Cross Street in Lowell and approached an intersection with School Street, its route was blocked by the victim's black Honda automobile, which was stopped in the middle of the street while the victim was waiting for his friend, Jeremy Richardson, to come out of his house.

Both Richardson and Tran testified as to what happened next. Their versions of the events at the start of the fight do not differ in any material respect. When Richardson came out of his house, he saw the victim and Hour each leaning "half-way out" of their cars and arguing. The victim left his car and five or six males emerged from the Cadillac. The group congregated near the Honda and Cadillac. Richardson placed a bag of beer (and other items) on the roof of his Jeep vehicle (parked in front of his house) and stood near the victim as the argument with the men from the Cadillac continued. Hour "poked [the victim] with something sharp;" the victim said "ow" and "aah" and "[w]hat are you doing?", and the argument became even more heated. A man from the Cadillac took a swing at Richardson, who hit the man back, and a general fight broke out. The fight soon separated into two groups. Richardson fought with Un and Leang, and they moved around the corner onto School Street. The victim remained on Cross Street fighting with the defendant, Hour, and Choeurn.

Tran testified that both Hour and Choeurn punched and kicked the victim "[a] lot of times" for "[f]ive minutes, less." During this time, the defendant was "giving [him] a punch, like a few punches." The defendant then "jumped" into the driver's seat of the victim's Honda. As the victim and the other two men continued to fight, they approached the Honda. The victim then stuck his head and upper body into the Honda through the driver's side window, and fought with the defendant. Half of the victim's body, including his chest, was in the car. As the victim and the defendant punched each other inside the Honda, Hour from the left and Choeurn from the right punched the victim from behind. Choeurn then took "out some little blade or a knife" and stabbed the victim. Tran stated that this was the first time she saw Choeurn wield the blade. While the victim leaned inside the Honda, Choeurn stabbed him "on the [right] side . . . five [or] less" times. After he had been stabbed ap-

proximately five times, the victim backed out of the car window and turned to fight off Choeurn and Hour. The portion of the fight during which the victim was leaning into his car while he was engaged with the defendant lasted "less than two minutes."

Tran stated that as soon as the victim and the defendant stopped fighting and the victim backed out of the car window, the defendant drove away in the Honda. The fight between the victim, Hour, and Choeurn continued with the victim running as Hour and Choeurn persisted in punching, kicking, and stabbing him. The victim circled the Cadillac and then Leang and Un returned from around the corner (where, it will be recalled, they had been engaged in a fight with Richardson). The latter two men joined Hour in punching and kicking the victim. The victim fell to the ground but Choeurn continued stabbing him.[5] Hour continued to punch the victim even after the other three ceased their attack, then dragged the victim to the curb, rifled through his pockets, and took his necklace. Leang eventually pulled Hour back to the Cadillac, and the entire group, minus the defendant, drove to Lynn. Tran testified that the incident lasted about twenty minutes, and estimated that the defendant drove away in the Honda approximately six minutes or less before the Cadillac left the scene.

Richardson's account of what he saw of the late stages of the fight differed from Tran's, especially with regard to the point at which the Honda left the scene. After Richardson moved around the corner, he could not see the victim. When the men he was fighting ran back around the corner to Cross Street, Richardson followed "right behind" them. At that point, the victim's car was still in the street and Richardson saw at least two people get into it. The other people were already in the Cadillac, and the two cars left together, with the Cadillac following "[r]ight behind" the victim's Honda, not even a couple of seconds later. Both cars passed Richardson as he approached the victim, who was lying on the ground.

A neighbor who lived near Richardson watched the fight from his apartment porch. The neighbor did not have a clear view of the entire scene, but testified that he saw the Cadillac

---

[5]Tran testified that she forgot exactly when the victim went to the ground, but that the defendant was no longer at the scene at that time.

parked behind the Honda, and that he saw four or five Asian men beating and stabbing a single person on the ground on Cross Street. Some of the men stopped fighting before the others, and at least one of them got into the Honda. He testified that the Honda and Cadillac were at the scene throughout the fight, and that the cars left at the same time. On cross-examination, however, he admitted that he could not actually see the Honda, and that he only saw the Cadillac leave. The police arrived in response to 911 calls, and found the victim bleeding profusely and gasping for air; he died shortly thereafter.

After the stabbing, the defendant returned to an apartment at 436 School Street where he had been earlier that night. The apartment was a few blocks from the scene of the stabbing. The defendant arrived alone in a black Honda and was carrying a brown bag. He offered beer to people there, explaining that he took it from some black people during a fight. The defendant told people at the apartment and on the telephone that "they" had stabbed someone. The defendant had red stains on his white pants, and changed into clean pants he obtained from someone in the apartment. He appeared to discard his white pants in a dumpster outside the apartment. The defendant arranged by telephone to be picked up some distance from the apartment, and left.

During the police investigation, it was determined that the victim's Honda had blood stains in various places, and the victim's blood was found both on and inside the car. The most notable amount of blood was on the half-open driver's side window where the victim had been leaning into the car. There was no evidence as to whose blood it was, but based on Tran's testimony, it was most likely the victim's. Blood on the steering wheel came from the victim. A smear of blood on the passenger seat contained deoxyribonucleic acid (DNA) from both the victim and Hour (Hour's hands were bloody from the fighting.) Blood on the driver's seat matched Hour's blood, but not the victim's.

Police recovered a pair of white pants from the dumpster behind 436 School Street. The pants were stained with the victim's blood in several areas. An autopsy of the victim determined that he had been stabbed eleven times — ten times

on the back and neck, and once on the chest. The stab wound to his chest, just below his right nipple, was the fatal blow. The physician who performed the autopsy testified that the victim would likely have collapsed anytime from instantly after receiving the fatal blow to ten minutes later.

The defendant was arrested on July 16, 2001, and gave the police several different versions of his actions on July 13 and 14. He eventually admitted that he had been in the Cadillac when it was blocked by the Honda, and that he got out to confront the victim. When Richardson emerged from his house, the defendant claimed he got scared and ran to the Honda. The victim reached in and punched him and he punched the victim back, then started the car and drove away to the apartment at 436 School Street. He claimed that he did not see anyone stab the victim and that he left during the fight.[6]

2. *Motion for required finding of not guilty.* The defendant moved for a required finding of not guilty at the close of the Commonwealth's case, and again at the close of all the evidence; pursuant to rule 25 (b) (2), he renewed his motion after the verdict.[7] He claims that his motions were improperly denied because his liability was predicated on a joint venture theory and there was insufficient evidence that he shared with his coventurers the mental state required for the crime of murder, i.e., malice.

In reviewing the denial of a motion for a required finding of not guilty, we "determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the

---

[6]Bol Choeurn and Pov Hour were tried together for their participation in the attack, in a trial separate from the defendant's. Choeurn was convicted of murder in the first degree as a principal and Hour was convicted of murder in the first degree as a joint venturer. Both convictions were affirmed. See *Commonwealth* v. *Bol Choeurn*, 446 Mass. 510 (2006); *Commonwealth* v. *Pov Hour*, 446 Mass. 35, 36 (2006).

[7]The rule states: "If the motion [for a required finding of not guilty] is denied and the case is submitted to the jury, the motion may be renewed within five days after the jury is discharged and may include in the alternative a motion for a new trial. If a verdict of guilty is returned, the judge may on motion set aside the verdict and order a new trial, or order the entry of a finding of not guilty, or order the entry of a finding of guilty of any offense included in the offense charged in the indictment or complaint." Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979).

contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged [citation omitted]. . . . [T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt . . . .' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).[8] We draw all permissible inferences in favor of the Commonwealth. See *Commonwealth* v. *Stewart*, 411 Mass. 345, 349-350 (1991); *Commonwealth* v. *Campbell*, 378 Mass. 680, 686 (1979).

The defendant was convicted of murder in the first degree based on a theory of extreme atrocity or cruelty. The Commonwealth proceeded against him only as a joint venturer. Thus, to sustain a conviction in these circumstances, the Commonwealth must have proved that one of the defendant's joint venturers committed an unlawful killing with malice and that the killing was committed with extreme atrocity or cruelty.[9] See G. L. c. 277, § 39; G. L. c. 265, § 1. See also *Commonwealth* v. *Semedo*, 422 Mass. 716, 719-720 (1996). Malice is defined in these circumstances as an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow. See *Commonwealth* v. *Perry*, 432 Mass. 214, 221-222 (2000). Since the Commonwealth was proceeding against the defendant as a joint venturer, it also had to prove the elements of joint venture: that the defendant was present at the scene, knowing that one of his coventurers intended to commit a crime, that he shared the mental state required for the crime of murder, i.e., malice, and that, by agreement, he was willing to help the others if necessary. See *Commonwealth* v. *Stokes*, 440 Mass. 741, 745 (2004). "The jury may infer the requisite mental state from

---

[8] The defendant presented no witnesses; thus, the Commonwealth's position did not change from the close of its case until the close of all the evidence. Cf. *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984).

[9] As to the factors that determine whether a killing is committed with extreme atrocity or cruelty, see *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

The defendant concedes that he threw a "few punches" and participated as a joint venturer in the assault and battery of the victim, but claims that when he got into the victim's Honda intending to steal it, he intended to "separate himself" from the incident by driving away. "In discussing a person's abandonment of a joint enterprise so as to avoid guilt for a subsequent crime, we have said that 'there must be at least an appreciable interval between the alleged termination and the [crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it.' " *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 (1988), quoting *Commonwealth* v. *Green*, 302 Mass. 547, 555 (1939). "A withdrawal or abandonment to be effective must, at the least, be communicated to one's joint venturers and communicated at such time as will give the others a reasonable opportunity to withdraw." *Commonwealth* v. *Mangula*, 2 Mass. App. Ct. 785, 792 n.6 (1975), citing *Commonwealth* v. *Green, supra* at 555. However, according to the testimony most favorable to the Commonwealth, that of Richardson and the neighbor, the defendant did not leave the scene until after the beating ended and the victim lay senseless on the ground.[10] He thus participated (by his own admission) in the original punching of the victim, a three-on-one attack. While in the Honda, he was present and available to assist his friends in a continuing assault on the victim or in their getaway.

Crediting the version of the evidence that favors the Commonwealth, the defendant remained in the Honda and did not leave Cross Street until the end of the attack, finally leaving the scene at the same time as the Cadillac. During the time the defendant remained at the scene, the victim continued to be pummeled, kicked, and stabbed by several attackers and eventually fell to the ground to die. The jury could have inferred from

---

[10]It will be recalled that the witnesses offered differing testimony as to when the defendant left the scene.

the fact that the defendant remained at the scene during this brutal beating that he kept himself in a position ready and able to help the other attackers. The jury also could have inferred that the defendant was willing and available to assist in the getaway of the joint venturers after the beating ended. At the least, a reasonable person in these circumstances would have recognized from the number of attackers and the nature of the attack (a severe beating with multiple stabbings) that there was a plain and strong likelihood that the victim would be killed.[11] In addition, viewing the evidence most favorable to the Commonwealth, he certainly did not communicate to his joint venturers an intent to abandon the enterprise.

In regard to the extreme atrocity or cruelty element, the evidence warranted a finding that the murder was committed with extreme atrocity or cruelty. "The victim's extensive and serious injuries certainly warranted a finding that whoever participated in the beating of the victim did so with extreme atrocity or cruelty." *Commonwealth* v. *Podlaski*, 377 Mass. 339, 346 (1979). To be guilty on a theory of joint venture, a defendant must share with the principal the mental state required for the crime; the requisite mental state for murder is malice aforethought. *Commonwealth* v. *Pucillo*, 427 Mass. 108, 112 (1998). *Commonwealth* v. *Semedo*, 422 Mass. 716, 720-721 (1996). "If the joint venturer has this intent and participates in a killing accomplished by means of extreme atrocity or cruelty, he is guilty of murder in the first degree." *Commonwealth* v. *Podlaski, supra* at 347, citing *Commonwealth* v. *Scanlon*, 373 Mass. 11, 17 (1977). See *Commonwealth* v. *Sinnott*, 399 Mass. 863, 879-880 (1987). See also *Commonwealth* v. *Freiberg*, 405 Mass. 282, 288, cert. denied, 439 U.S. 940 (1989) (no requirement of intent to inflict extraordinary pain or suffering to convict of murder based on extreme atrocity or cruelty). "[A]s to this type of murder in the first degree, even the principal need not have an intention to use atrocious or cruel means or indeed know that the particular conduct constitutes atrocity or cruelty." *Commonwealth* v. *Podlaski, supra* at 347. If the principal's actions warrant a finding of extreme atrocity or

---

[11]The jury would also have been warranted in inferring an intent on the part of the defendant to inflict serious bodily harm.

cruelty, the joint venturer is responsible for those actions. Once proof of the joint venture is shown, the joint venturer shares the culpability of the principal. It is not necessary that the joint venturer himself commit the act or acts that warrant the finding of extreme atrocity or cruelty. *Id.* See *Commonwealth* v. *Sinnott,* *supra* at 879-880; *Commonwealth* v. *Monsen,* 377 Mass. 245, 254 (1979) ("An accomplice who possesses the necessary malice aforethought to justify a conviction of murder in the second degree may legitimately be convicted of murder in the first degree if his partner accomplishes the crime in an extremely atrocious or cruel manner").[12]

In arguing that his motion for a required finding should have been granted, the defendant claims that there was no evidence that the attack was planned or that the defendant knew that one of his coventurers was armed. Specific evidence of planning is not necessary. *Commonwealth* v. *Semedo, supra* at 719, citing *Commonwealth* v. *Longo,* 402 Mass. 482, 488 (1988) (conduct of group of men converging on victim and administering beating permitted jury to infer agreement). The Commonwealth need not prove that the defendant knew that a joint venturer was armed, as long as it proves that the defendant possessed malice and participated in the joint venture. *Commonwealth* v. *Semedo, supra* at 721. In the present case, a vicious beating of one man by several assailants creates an inference of intent to do grievous bodily harm or, at least, to do an act which would create a plain and strong likelihood of death.

3. *Entry of a finding of guilty of a lesser included offense.* As stated, the judge allowed the defendant's rule 25 (b) (2) motion and reduced the verdict to manslaughter. The Commonwealth appeals, requesting that we reinstate the jury verdict of murder in the first degree. We affirm the judge's order.

---

[12]*Commonwealth* v. *Semedo,* 422 Mass. 716, 721-722 (1996), is not to the contrary. In that case there was evidence that the defendant actively participated in the extremely atrocious or cruel conduct, though not necessarily that he inflicted the fatal blow. The court described his involvement in discussing the adequacy of the evidence to warrant a finding of guilty as a joint venturer. See, to the same effect, *Commonwealth* v. *Sinnott,* 399 Mass. 8632, 873 (1987). Nothing in the above two cases was meant to imply that a defendant must have personally committed extremely atrocious or cruel acts to be convicted as a joint venturer.

A trial judge has the authority, pursuant to rule 25 (b) (2), to reduce a verdict, despite the presence of sufficient evidence to support the jury's verdict. *Commonwealth* v. *Woodward*, 427 Mass. 659, 666-667 (1998). Although the purpose of the power to reduce a verdict is "to ensure that the result in every criminal case is consonant with justice," *id.* at 666, the power is to be used "sparingly," *id.* at 667, and the judge is not to sit as a "second jury." *Commonwealth* v. *Keough*, 385 Mass. 314, 321 (1982). "A most important consideration is whether the jury verdict is markedly inconsistent with verdicts returned in similar cases." *Commonwealth* v. *Gaulden*, 383 Mass. 543, 556 (1981). Our role is not to decide whether we would have acted as the trial judge did. The judge "has the advantage of face to face evaluation of the witnesses and the evidence at trial" and is therefore in "a far better position than we[] to make the judgment required by [rule 25 (b) (2)]." *Commonwealth* v. *Cobb*, 399 Mass. 191, 192 (1987). We decide only whether the judge abused his discretion or committed other error of law. *Commonwealth* v. *Gaulden, supra* at 557.

"A judge's discretion to reduce a verdict pursuant to rule 25 (b) (2) is appropriately exercised where the weight of the evidence in the case, although technically sufficient to support the jury's verdict, points to a lesser crime. Thus, for example, where evidence of premeditation was 'slim,' the judge did not abuse his discretion in reducing a verdict of murder in the first degree to murder in the second degree." *Commonwealth* v. *Rolon*, 438 Mass. 808, 821 (2003), citing *Commonwealth* v. *Ghee*, 414 Mass. 313, 322 (1993); *Commonwealth* v. *Millyan*, 399 Mass. 171, 188-189 (1987). "Similarly, where the weight of the evidence suggests that the defendant did not act with malice, a murder verdict may be reduced to manslaughter." *Commonwealth* v. *Rolon, supra* at 821, citing *Commonwealth* v. *Woodward, supra* at 669-671 & n.14; *Commonwealth* v. *Cobb, supra* at 192; *Commonwealth* v. *Keough, supra* at 320-321; *Commonwealth* v. *Gaulden, supra* at 557-558; *Commonwealth* v. *Greaves*, 27 Mass. App. Ct. 590, 594 (1989). We must examine, therefore, whether there was "some weakness in the evidence," *Commonwealth* v. *Rolon, supra* at 822, that the defendant committed murder in the first degree and determine

whether the judge was correct in concluding that the evidence is more consistent with a lesser form of homicide.

The judge's comprehensive and detailed written memorandum explaining his reasons for reducing the verdict to manslaughter is helpful in this examination. See *Commonwealth* v. *Gaulden*, *supra* at 556 (judge should state reasons for reducing verdict). The judge concluded that a conviction of murder in the first degree was not consonant with justice for a defendant who participated "so minimally in the victim's death." The judge first considered the evidence in its light most favorable to the Commonwealth. Such evidence indicated that the defendant punched the victim on the street and entered the Honda before a knife was used or in view[13]; he fought off the victim's efforts to remove him from the car before and after the victim was stabbed by Choeurn; he remained in the car while the beating, kicking, and stabbing of the victim continued; finally, he drove off with the other joint venturers after he saw that the victim was lying in the street dying. There is no evidence that, at the time the defendant entered the Honda, he was aware that Choeurn had a knife or that anyone intended to do more than beat the victim. In sum, even in the light most favorable to the Commonwealth, all the defendant did after he was aware that this was more than a fistfight was to remain in the Honda and then flee the scene, at most clearing the lane of traffic so that the Cadillac could depart freely. As the judge stated, "there is no evidence that [the defendant] initiated the use of deadly force or had any advance knowledge that Choeurn was armed with a knife, and his role in the murder once he realized that deadly force was being used was simply to remain in the Honda and be available to assist in the getaway."

The judge was not limited, however, to viewing the evidence

[13]Richardson stated that, at the outset of the attack (before the defendant entered the Honda), the driver (Hour) poked the victim "with something" and the victim said "ow" and "aah" and "[w]hat are you doing?" Richardson stated that he did not see what evoked the victim's exclamations and nothing else indicates that the victim was stabbed at this time. Indeed, all other testimony is that Choeurn was the person in possession of the knife. Thus, even reading the evidence in its light most favorable to the Commonwealth, this testimony does not warrant an inference that the victim was stabbed by Hour before the defendant got into the Honda.

in the light most favorable to the Commonwealth, see *Commonwealth* v. *Keough, supra* at 318-319, but instead was correct to consider the over-all weight of the evidence. Viewing the evidence in this manner, the judge noted that Tran had testified, contrary to the evidence that is most favorable to the Commonwealth, that the defendant drove off in the Honda some minutes after the victim withdrew from it and devoted his attention to fending off Choeurn's stabbing attack.[14] The judge noted that Tran was the only eyewitness present for the entire incident and the only one in a position to see everything; she had no motive to fabricate and her testimony was not weakened during cross-examination. The neighbor who testified that the Honda remained on the scene and left with the Cadillac after the attack ended had no apparent motive to lie either, but his view of the scene was imperfect. The judge also observed that Richardson's testimony, including his statement that the Honda and the Cadillac sped off together in the same direction, may have been compromised by his participation in the events. (Richardson's testimony was inconsistent too with his statement to the police shortly after the incident that the two cars sped off in different directions on School Street.)

The judge concluded that, regardless of whose version of events was accepted, the defendant's role in the victim's death was so minimal that justice would not be served by a conviction of murder in the first degree. The judge surveyed our appellate cases and reasoned that this defendant's role in the killing was less significant than that of defendants typically convicted of that offense. See *Commonwealth* v. *Woodward, supra* at 670-671 (court may consider whether jury verdict of murder is "proportionate with convictions in other cases"). The judge invited the Commonwealth to cite other comparable cases and only two cases were named: *Commonwealth* v. *Maynard,* 436 Mass. 558 (2002), and *Commonwealth* v. *Perry,* 432 Mass. 214 (2000). Those cases involved two defendants tried separately for the death of a young man after months of torture and beatings. Both those defendants actively participated in the long-time vicious physical abuse of the victim. At one point, Perry and May-

---

[14]Tran testified that the attack lasted about twenty minutes and that the defendant was present until the "last six minutes."

nard took turns beating the victim for thirty to forty-five minutes, slamming the victim's neck on the floor, and then holding him down and hitting him across his neck. Perry and Maynard ripped the victim's scalp open by "raking" keys across his head. The two men punched the victim with a bicycle chain wrapped in tape so as to form a type of brass knuckles and, in so doing, opened a one-inch wound above the victim's eye. A later beating was even worse and deformed the victim's face. When the young man finally died, both Perry and Maynard helped dispose of his body. After the victim's death, Perry confessed to beating the victim, kicking him with his work boots, hitting him with dumbbell bars, watching him lose weight and grow weak, and "slapping" him the night he died.

As the judge concluded, the actions of Perry and Maynard are in significant contrast to those of the defendant here, and "illustrate[] why justice requires [this defendant] to be punished less severely than Perry and Maynard." Whatever view one takes of the evidence in the present case, the defendant's role was a much more "passive participation" than that of most other defendants convicted of murder in the first degree on a theory of extreme atrocity or cruelty. See *Commonwealth* v. *Ghee*, *supra* at 321-322.[15]

The order denying the renewed motion for a required finding of not guilty and the order allowing the motion to reduce the verdict to manslaughter are both affirmed, and the conviction of involuntary manslaughter is therefore affirmed.

*So ordered.*

[15]The Commonwealth and the dissent suggest that the judge improperly considered the sentence for murder in the first degree as a factor in his decision to reduce the verdict. The judge did write that the defendant's actions did not justify a sentence of life imprisonment without parole. We do not take this to mean, however, that the judge considered the sentence as a reason for reducing the verdict. We interpret these words as merely an alternative means of stating that the verdict did not comport with justice.

Rule 25 (b) (2) is not a tool for reducing a sentence to avoid imposition of a minimum mandatory sentence that appears "unjust." Minimum mandatory sentences reflect a legislative determination of the appropriate sentence for a certain offense. The considerations for reducing a verdict under rule 25 (b) (2) are unrelated to sentencing considerations, a subject particularly within the authority of the legislative branch.

SPINA, J. (dissenting, with whom Greaney and Ireland, JJ., join). Even if the defendant's level of participation in the beating and wounds inflicted on the victim was considerably less than that of Bol Choeurn and Pov Hour, there is no weakness in the evidence of his participation in the joint venture to kill the victim with malice and extreme atrocity or cruelty. See *Commonwealth* v. *Rolon*, 438 Mass. 802, 822 (2003). I respectfully dissent from the court's conclusion that the judge acted within his discretion and committed no error of law in reducing the verdict to manslaughter.

There is no doubt that had the victim died as a result of the blows inflicted by the defendant acting alone, the conviction should be for a crime no greater than manslaughter. However, because the defendant participated in a joint venture, he is responsible for the conduct of his coventurers as well as his own. See *Commonwealth* v. *Semedo*, 422 Mass. 716, 721 (1996); *Commonwealth* v. *Podlaski*, 377 Mass. 339, 347 (1979). The result in this case can be explained only by the court's approval of the trial judge's erroneous parsing of the acts of the defendant from those of his coventurers, from which the judge concluded that the defendant "participat[ed] . . . minimally in the victim's death." Contrary to this analysis, the weight of the evidence points solidly to a vicious twenty-minute onslaught against the victim by three men, one of whom was the defendant. The jury easily could have inferred from the circumstances of the attack that there was a plain and strong likelihood of death and that the defendant and his coventurers shared a malicious intent. See *Commonwealth* v. *Champagne*, 399 Mass. 80, 87 (1987); *Commonwealth* v. *Podlaski, supra.*

Even if, as Oahn Tran testified, the defendant left five or six minutes before the attack ended, his departure was not a disengagement from the venture. His removal of the victim's car was an act in furtherance of the venture, enabling the group to escape in the Cadillac automobile whose path was blocked by the victim's car. Although the judge concluded that once the defendant realized that deadly force was being used, he did no affirmative act to aid the others in the murder of the victim other than clear the way for them to get away, that act cemented his role in the venture rather than disengaged him from it. See

*Commonwealth* v. *Angiulo,* 415 Mass. 502, 519 (1993); *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 548 (1990). He did not just walk away from the fight; he cleared the way for everyone to escape. The defendant is responsible for what he and the others did to the victim.

Moreover, parsing the defendant's acts from those of his associates ignores the law of joint venture, which requires only that a defendant stand by and be ready to assist the principal and that he share with the principal the requisite mental state to commit the crime. The jury well could have concluded that the defendant's participation "emboldened" Choeurn and Hour to act as they did, and that he shared with them a malicious intent. That is the essence of joint venture. *Commonwealth* v. *Cintron,* 435 Mass. 509, 515 (2001). Although the defendant may not have been the initial aggressor, there is no requirement that he play that role. His decision to drive the victim's car raised the stakes against the victim and forced him to defend not only himself but his property as well. While the victim was fighting with the defendant to defend his property, he was distracted and rendered vulnerable to attack from behind by Choeurn and Hour, which eventually led to his death.

The defendant's level of involvement does not even approach the "hypertechnical" participation at the "outer fringes of a joint venture" that we intimated might lead to a reduction in the verdict. *Commonwealth* v. *Rolon, supra* at 824. The judge's parsing of the defendant's conduct from that of his coventurers was error.

There is a second error in the judge's analysis. Twice in his decision, once early and once late, the judge expressed concern that the defendant was convicted of murder in the first degree "with its mandatory sentence of life imprisonment without parole." There can be no doubt that the punishment figured prominently in the judge's reasoning, and that it was not just a slip of the tongue. He justified his consideration of the minimum mandatory punishment as necessary because "[t]he jury . . . [were] not asked to determine which crime of homicide [they] believed to be most consonant with justice in view of the criminal penalties that apply to those various crimes." The sentence, albeit mandatory, is irrelevant to the verdict and should

not have been considered. *Commonwealth* v. *Rolon, supra* at 822. It is the verdict, and whether the settled evidence pointed to the verdict, that should have been the sole focus of the judge's inquiry. See *Commonwealth* v. *Smallwood*, 379 Mass. 878, 882 (1980); *Commonwealth* v. *Mutina*, 366 Mass. 810, 826-827 (1975).

By approving the judge's consideration of punishment under the minimum mandatory structure of the murder statute, the court endorses a misuse of Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), that can be used to thwart the will of the Legislature whenever a defendant is convicted of violating a statute that provides for imposition of a minimum mandatory sentence. Irrespective of a judge's view that a defendant's conviction of a crime under a theory of joint venture is unjust because of the attendant minimum mandatory punishment, he or she may not reduce the verdict. This is not only an error of law, but it is terribly unfair to the jury, who are required to render their verdict without regard to punishment.

I would vacate the order reducing the verdict.