SUPERIOR COURT 
 
 COMMONWEALTH vs. PALLAVI MACHARLA

 
 Docket:
 2015-128
 
 
 Dates:
 August 19, 2019
 
 
 Present:
 /s/Kenneth J. Fishman Justice of the Superior Court
 
 
 County:
 MIDDLESEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR POST-TRIAL RELIEF

 
 

 After a four-week trial, the defendant, Pallavi Macharla, was found guilty of murder in the second degree for the death of Ridhima Dhekane, a six-month old child that was in her care. The defendant had been charged with murder in the first degree on a theory of extreme atrocity and cruelty, but the jury also was instructed on second-degree murder, and involuntary manslaughter under the theories of battery and wonton or reckless conduct.[1]
 The defendant asserts that she is entitled to relief under Mass. R. Crim. P. 25(b)(2) and 30(b) on several grounds. First, she claims that a new trial is required under both rules because this Court should have instructed the jury that the evidence did not show that the defendant's failure to personally call 911 caused the child's death. Second, the defendant maintains that this Court should enter a finding of not guilty under Rule 25(b)(2) because there was insufficient evidence on the element of malice. Finally, again citing Rule 25(b)(2), the defendant asserts that this Court should enter a verdict of the lesser-included offense of involuntary manslaughter because such a verdict would be consonant with justice.
---------------------------
 
[1]As discussed below, the defendant initially opposed a lesser-included instruction on involuntary manslaughter under any theory. Ultimately, the defendant did not object to the instructions of involuntary manslaughter on theories of battery and wonton or reckless conduct, and this Court agreed that the record did not support an instruction on a theory of involuntary manslaughter on a failure to act, and, therefore, did not instruct on same.
 -1-
 After hearing, and upon review and consideration, the motion for the entry of a judgment of acquittal and for a new trial is DENIED for the same reasons that similar motions were denied after the close of the Commonwealth's evidence and the close of all the evidence. Insofar as the motion seeks the entry of a finding of guilty of the offense of involuntary manslaughter rather than murder in the second degree, the motion is ALLOWED.
BACKGROUND 
 This case, in every sense, was a battle of the experts. There were no eyewitnesses to the alleged infliction of head trauma by the defendant on the child victim. There was no physical evidence supporting the notion that the victim was struck with an object or struck an object such as would cause abusive head trauma. There were no external indicia of blunt-force trauma such as swelling, bruising, laceration, or external swelling. There was no evidence of prior history of abusive treatment of this or any other child, animosity, frustration, or other emotional factor on the part of the defendant indicative of a motive to commit murder. The defendant did not confess, but rather gave statements on the date of occurrence and on the witness stand at this trial that were largely consistent and that constituted a clear denial of engaging in any conduct that would have led to the death of Ridhima Dhekane.
 There was, however, evidence from first responders, treating physicians and experts — numerous experts — from which a jury could have legally found that the injuries sustained by the child were the result of inflicted head trauma leading to the child's death.
 1. Factual Background 
 The defendant, who was a doctor in India specializing in diabetes, arrived in the United States in 2005. She has not obtained a license to practice medicine in this country. The defendant lived across the street from Ridhima's family, and began caring for her in the first
 -2-
week of February 2014. The defendant watched Ridhima generally three to four days each week because both of the child's parents worked. Ridhima was by all accounts a healthy infant prior to the events that caused her death.
 On Wednesday, March 26, 2014, the defendant advised Ridhima's mother that the child was sleeping more than usual. The mother thought it was because her daughter had been up late the previous night swimming. Ridhima's father, per the usual protocol, delivered the child to the defendant on the morning of Thursday, March 27, 2014. He advised the defendant that she had only taken some of her bottle, approximately two ounces. When the child's mother called the defendant at 9:19 a.m., the defendant informed her that the child had not been fed milk, but that there were no concerns. According to the defendant, the baby went back to sleep shortly thereafter and slept on the bed for a long time until about 12:30 or 1:00 p.m. There were no other children at the home at the time, including the defendant's own children.
 At 2:40 p.m. the same day, Ridhima's mother received a phone call from the defendant saying that the baby was not breathing. The mother indicated that she would come there, and rushed to the apartment, at which point the defendant gave the baby to her. The baby was limp and barely breathing. The mother gave the child back to the defendant and called 911, the defendant having not done so previously. After the child's mother arrived, the defendant told her that she had fed the child applesauce that the mother had prepared, that the child had thrown up, and then, when the defendant was changing the child's clothes, the child had become unconscious. At that point, the defendant changed the clothes and began administering mouth-to-mouth resuscitation, which in fact the mother observed her doing when she arrived at the apartment. The defendant also performed resuscitation efforts after the mother arrived.
 -3-
 When the EMTs and paramedics arrived, they observed the child was not breathing and was unresponsive with no pulse. They attempted CPR and ultimately inserted a breathing tube. There were no signs of gross trauma and there was no neurological activity. The baby was taken to Lahey Clinic where she again presented with no pulse, did not exhibit any spontaneous movements, and was breathing with the aid of the tube. By all accounts, at that point, she had not been breathing for at least twenty minutes. No external signs of trauma were observed, and her eyes were fixed and dilated.
 Later the same day, the child was transported to the Boston Children's Hospital intensive care unit from Lahey. The baby was comatose. Her eyes were fixed and dilated, and there was evidence of retinal hemorrhaging. A CT scan of the head was deemed abnormal with hematomas in multiple locations of the brain, as well as edema.
 There were multiple findings, including bilateral subdural hemorrhages, subarachnoid hematomas, intraventricular hemorrhaging, subscapular hemorrhage, subperiosteal hemorrhages on multiple planes of the head, and numerous bilateral, multilayered retinal hemorrhages with retinoschisis and retinal folds. No skull fractures or cerebral swelling was observed. An MRI done the following day revealed retinal tearing and that the brain stem and spinal cord were being pushed down upon. A scan of the spinal cord suggested the presence of a compression fracture. Differential diagnoses were made and the prognosis was that there was high likelihood that her condition was leading to brain death. MRI findings were consistent with brain death. The internal injuries observed suggested to the doctors at Boston Children's Hospital led to a determination that the most likely of the diagnoses was that the child had suffered head trauma. She was observed to have irreversible injury. The determination of death by neurological criteria was met on March 30, 2014.
 -4-
 2. Expert Testimony 
 Testimony from some of the Boston Children's Hospital treating physicians, as well as from five of the six experts called by the Commonwealth, supported the conclusion that the child was a victim of inflicted head trauma that caused her to go into respiratory arrest and then, consequently, cardiac arrest. Their diagnoses were based on findings described above, particularly the retinal hemorrhages. Some experts further opined, based on a scan done at Boston Children's Hospital, that there were multiple, consecutive anterior vertebral compression fractures. In contrast, the defense experts suggested that the substantial bleeding observed was due to oxygen and circulation deprivation over a long period of time, and that this hypoxicischemic state led to damaged tissues and blood vessels, which leaked blood upon the restoration of blood flow (reperfusion) and medical interventions.
 Refuting the defense theory, one of the Commonwealth's experts, Dr. Lori Frasier, a child-abuse pediatrician, opined that the cause of Ridhima's death was severe inflicted head trauma consisting of both impact and shaking with significant force, such that it could not have been accomplished by children of four or seven years old such as the defendant's son who came home from school while Ridhima was still at the defendant's home, or Ridhima herself.
 In contrast, defense experts opined that the cause of death was the child vomiting chunky applesauce that became stuck in the trachea, which in turn led to the loss of oxygen to the brain and the ultimate cardiac arrest. Dr. Elizabeth Laposata, the Rhode Island Medical Examiner, opined that an adult's shaking could not have caused the injuries found here and that that there were no findings of a neck injury, bucket-handle fractures or other exterior indicia of trauma that would support the conclusion that the death resulted from blunt force or violent shaking trauma.
 -5-
 The defendant also presented the testimony of Dr. Kenneth Monson, a professor of mechanical engineering, who had studied the use of biomechanics in connection with traumatic brain injury. He opined that biomechanical data does not support the idea that shaking can produce subdural intraventricular hemorrhaging especially in a larger child, and that an adult cannot shake a twenty-pound child such as Ridhima enough to produce subdural and retinal hemorrhages. The Commonwealth did not present any biomechanical evidence.
 There was also considerable controversy over whether there were actually compression fractures in the spinal cord. Dr. Andrew Rosenberg, a specialist in bone and soft tissue pathology, conducted an analysis and opined that mechanical forces caused compression fractures to the vertebrae. This determination was consistent with Boston Children's Hospital MRI findings, which suggested the presence of compression fractures in four consecutive bones. The hospital radiologist noted, however, that such a determination would be best made as a result of an autopsy. Dr. James Meldrum, testifying for the defense, found no sign of fracture, concurring with the testimony of pediatric pathologist Dr. Marta Cohen, who said that although there were abnormalities, there were no compression fractures or vertebral fractures.
 A particularly notable exception to the Commonwealth's experts' consensus that trauma had occurred was the opinion of Dr. Anna McDonald, the forensic pathologist who performed the original autopsy. In May 2014, she authored a report under the supervision of Dr. Henry Nields, who was the chief medical examiner at the time. The original autopsy was her first involving an allegation of a shaken baby. When she observed the retinal hemorrhages, she asked Dr. Nields about them. He gave her an article indicating that the association of blunt-force injury impact with such hemorrhages is a black and white issue. Her conclusion on the original autopsy
 -6-
follows his advice. The report concludes that the death resulted from blunt-force trauma and shaking injuries of the head.
 In December 2015, when she was no longer working for the Massachusetts Office of the Chief Medical Examiner but rather was employed in North Carolina, Dr. McDonald undertook a re-examination of her findings in this case with the benefit of additional information, including police reports, Boston Children's Hospital records, slides, photographs, and an email from Dr. Laposata. As a result of this re-examination years later, Dr. McDonald felt ethically bound to correct her prior opinion. In March 2016, she wrote a letter to Dr. Nields and the prosecutor in this case indicating that she had changed her diagnosis, and now concluded that the manner and means of death was not abusive head trauma, but rather that the cause of death was undetermined.
 Dr. McDonald's change of opinion was based on the following. She noticed that the diffuse area of blood under the scalp was more than was typical of an impact site. Together with the fact that there was no exterior swelling, abrasions, or bruising on the child, she could not say there was an impact. She ultimately concluded that the child was not struck on the head. Rather, she opined that the child suffered from hypoxic-ischemia brain injury, with the subdural and retinal hemorrhaging occurring as a result of reperfusion. Dr. McDonald's awareness of the controversy relating to shaken-baby syndrome, which came about after the original autopsy, also informed her updated opinion. The lack of evidence of trauma or injury to the neck, as well as the absence of blood, rib fractures, fingerprints or thumbprints on the body, and compression fractures, which she felt did not exist as alluded to by the Children's Hospital radiologist at the time, further supported her opinion that a violent shaking did not cause injury in this case.
 -7-
 Based on these conclusions, Dr. McDonald offered to change the death certificate to a finding that she could not determine what caused the heart to stop. When Dr. Nields received the letter from Dr. McDonald, he did not authorize a change of the death certificate, opining that the cause was indeed blunt impact and shaking injuries to the head. He did not conduct a further review of the autopsy or engage in any additional testing. He did consult with Dr. Andrew Rosenberg, Dr. Alex Levin, and others, who ultimately appeared at trial as expert witnesses for the Commonwealth.
 3. Other Relevant Evidence
 The Commonwealth presented no non-medical corroborating evidence of its theory of the cause of death. In contrast, there was evidence to support the fact that Ridhima had vomited while in the care of the defendant after eating the applesauce. Not only was that the version of events testified to by the defendant and provided to the police on March 27, 2014, physical evidence obtained at the defendant's apartment supported the fact that the baby had vomited on the seat in which she was placed and on her clothing.
 The Commonwealth also called several lay witnesses who testified that the defendant was a calm, patient, and kind individual. The limited childcare work she had done resulted in her becoming recommended to Ridhima's parents, and she never seemed to be upset or frustrated. In her initial statement to the police, the defendant omitted the fact that her neighbor, Nabi Shahul, had watched Ridhima for about thirty minutes while the defendant went with another neighbor to pick up her son at school, as the defendant did not drive.[2] She did rectify that omission shortly thereafter, advising the police that she had omitted that information. Most
---------------------------
 
[2] The jury was instructed on consciousness of guilt due to the defendant's failure to provide that information to police.
 -8-
significant, Nabi Shahul testified that the baby slept during the thirty minutes she was there and Shahul did not observe any difficulties with the child.
 4. Relevant Instructions and Rulings
 The Commonwealth requested that this Court instruct the jury on first-degree murder on a theory of extreme atrocity and cruelty, second-degree murder, and involuntary manslaughter based on three theories. Those consist of an unlawful killing unintentionally caused by: 1) wanton or reckless conduct; 2) a battery that the defendant knew or should have known created a high degree of likelihood that substantial harm will result to another; and 3) wanton or reckless failure to act. At the charge conference, the defendant objected to an instruction on the third theory of involuntary manslaughter and sought a factual instruction that the evidence did not show that the defendant's failure to call 911 caused the child's death.
 Based on the defendant's objection, and because there was no evidence that the defendant's failure to call 911 caused the child's death, this Court expressly declined to instruct on the third theory of involuntary manslaughter. Therefore, consistent with the model homicide instructions, this Court instructed the jury on first-degree murder on a theory of extreme atrocity and cruelty, second-degree murder, and the first two theories of involuntary manslaughter. This Court also was careful to omit any language in the instructions suggesting that an omission or failure to act may constitute wanton or reckless conduct, so as to permit a conviction on the first theory of involuntary manslaughter on that basis. This Court declined, however, to additionally provide the factual instruction the defendant requested.
 When ruling on the defendant's motion for required finding of not guilty, this Court noted that the evidence was "not overwhelming" against the defendant.
 -9-
DISCUSSION
 1. 911 Call and Sufficiency of the Evidence
 Turning first to the 911 call, the defendant claims she is entitled to a new trial under Rules 25(b)(2) and 30(b) because this Court failed to provide the factual 911-causation instruction requested, which, in turn, led to an improper finding of malice. "Pursuant to rule 25(b)(2), a trial judge has discretion to award a new trial on the ground that the verdict, although supported by legally sufficient evidence, was against the weight of the evidence, . . . or because its integrity was suspect." Commonwealth v. Doucette, 408 Mass. 454, 455-456 (1990) (citation omitted). Rule 30(b) allows a trial judge to "grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30(b). See Commonwealth v. Lane, 462 Mass. 591, 597 (2012). The defendant is not entitled to relief under either rule based on the argument presented.
 For both first degree murder by extreme atrocity or cruelty and second degree murder, the Commonwealth was required prove malice in one of three ways -- that the defendant: 1) intended to kill Ridhima Dhekane; 2) intended to cause grievous bodily harm to Ridhima Dhekane; or 3) intended to do an act which in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result. Commonwealth v. Earle, 458 Mass. 341, 346 (2010); Commonwealth v. Semedo, 422 Mass. 716, 720 (1996). Citing the lack of any evidence of intent to harm Ridhima, it is under the third prong that the defendant argues the jury gave undue weight to the defendant's failure to call 911, so as to reach its finding of malice. In other words, the defendant argues that the jury must have concluded that the defendant's intentional failure to call 911 was the knowing act that created a plain and strong likelihood of death.
 -10-
 First, to the extent the defendant argues otherwise, the defendant's failure to call 911 was relevant and material to the malice issue. To the extent it could have supported the conclusion that the defendant was indifferent to Ridhima's suffering was a consideration appropriate to a determination of extreme atrocity or cruelty.[3] It also was relevant to counter the defendant's argument that her performance of life-saving measures was inconsistent with a malicious state of mind.
 Second, contrary to the defendant's argument, the 911 evidence was not the only evidentiary path available to the jury to reach its verdict. If the jury believed the Commonwealth's medical testimony and experts' opinions concerning blunt-force trauma and/or repeated violent shaking, there was evidence by which it could find third-prong malice, i.e., that the defendant committed an intentional act which in the circumstances known to her a reasonable person would have understood created a plain and strong likelihood of death. This conclusion is arguably further supported by the defendant's own professional medical background. Given the number of experts the Commonwealth presented, and the nature of their testimony, this Court therefore cannot say that the jury's verdict was against the weight of the evidence.
 Furthermore, and equally important, presuming the jury found facts based on the evidence presented, which did not link the defendant's failure to call 911 to Ridhima's death, and followed this Court's instructions, there simply was no basis upon which the jury could have improperly found malice based on 911-related causation. See Commonwealth v. Silanskas, 433 Mass. 678, 702 (2001) (jury presumed to follow instructions). This is not a case like Commonwealth v. Azara, 435 Mass. 675 (2001). There, the Supreme Judicial Court held that
---------------------------
 
[3] See Commonwealth v. Linton, 456 Mass. 534, 553 (2010) (sufficient evidence of extreme atrocity or cruelty where, among other factors, defendant did not call for emergency aid after strangling victim and leaving her unconsciousness behind lock door).
 -11-
the trial judge improperly instructed the jury on third-prong malice such that in the face of conflicting evidence similar to that present in the case at bar, a jury would not have understood that it was required to find a plain and strong likelihood of death, but rather simply could have been satisfied that the defendant intended to do an act that a reasonable person would have known created a plain and strong likelihood of grievous bodily harm. Id. at 686-689.
 As for the defendant's second claim, that there was insufficient evidence of a required element for second-degree murder, i.e., malice, that claim fails because, as reviewed above, as a matter of law there was sufficient evidence to satisfy that element.
 2. Motion to Reduce Verdict
 The most difficult of the defendant's claims to resolve is her claim that this Court should reduce the verdict to involuntary manslaughter to ensure that the result in this case is "consonant with justice." Commonwealth v. Chhim, 447 Mass. 370, 381 (2006), quoting Commonwealth v. Woodward, 427 Mass. 659, 666 (1998). Clearly, this Court is empowered under Rule 25(b)(2) to reduce the verdict and has the discretion to do so "where the weight of the evidence in the case, although technically sufficient to support the jury's verdict, points to a lesser crime. Thus, for example, where evidence of premeditation was 'slim,' the trial judge did not abuse his discretion in reducing a verdict of murder in the first degree to murder in the second degree." Chhim, 447 Mass. at 381, quoting Commonwealth v. Rolon, 438 Mass. 808, 821 (2003). As the Chhim court further noted, "[s]imilary, where the weight of the evidence suggests that the defendant did not act with malice, a murder verdict may be reduced to manslaughter." Id, quoting Rolon, 438 Mass. at 821
 As the Supreme Judicial Court has repeatedly observed, "[w]e deferred to the trial judge because he has the advantage of face-to-face evaluation of the witnesses and the evidence at trial.
 -12-
He is in a far better position than we are to make the judgment required by [Rule 25(b)(2)]." Woodward, 427 Mass. at 668, quoting Commonwealth v. Cobb, 399 Mass. 191, 192 (1987). "Indeed, 'the judge is not foreclosed from considering the defendant's testimony . . . and, if he believes it, relying on it." Woodward, 427 Mass. at 668-669, citing Commonwealth v. Keough, 385 Mass. 314, 321 (1982). In Woodward, the Court further stated:
 
The difference between the elements of the third prong of malice and . . . involuntary manslaughter lies in the degree of risk of physical harm that a reasonable person would recognize was created by particular conduct, based on what the defendant knew. The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death. . . . The risk that will satisfy the standard for . . . involuntary manslaughter involves a high degree of likelihood that substantial harm will result to another.
Id. at 669-670 (citations and internal quotation marks omitted).
 It is the absence of evidence other than that relating to the internal injuries suffered by Ridhima, the cause for which is seriously contested, and other evidence inconsistent with the kind of malice required for second degree murder, that causes this Court to believe that the verdict is not consonant with justice and that the reduction to the lesser offense of manslaughter is necessary.
 As in Woodward, there was no evidence in the case at bar of repeated caretaker abuse. 427 Mass. at 670. Indeed, to the contrary, it appears that the defendant had no history of abusive behavior towards children in the past, but rather was a patient, considerate, and loving caretaker of children. The defendant engaged in life-saving efforts once the child became non-responsive and has been relatively consistent, and this Court finds, credible, in her account of the events of that day. Moreover, there was no physical evidence in the apartment or present externally on the child's body to support the conclusion that there was any blunt-force trauma involved. Neither
 -13-
is there evidence of an accident having occurred in this case, other than the defendant's experts' theory that it was the choking on the applesauce that initiated the physical reactions that resulted in the baby's death.
 There is, however, a child who has tragically died, coupled with evidence of extraordinary internal injuries that some experts would attribute to abusive head trauma in the form of shaking and/or a blow. There is also no controversy that whatever happened to this child occurred, or at least was initiated, while she was in the care of the defendant.
 This Court cannot permit a verdict of second-degree murder to stand in the presence of such highly contested and inconsistent evidence.
 As the Supreme Judicial Court noted in Commonwealth v. Epps, 474 Mass. 743, 760-761 (2016), at the time of that trial, "[t]here were also published articles that identified the methodological shortcomings of the research supporting the majority view on shaken baby syndrome, and that highlighted the difficulties faced by physicians in accurately diagnosing the cause of injuries that appear to have been caused by child abuse." Indeed, the Epps decision cites in detail the literature that was at the heart of the debate. Since that time, the debate has gone unabated with additional authorities lining up on either side of the argument. For instance, the Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU) authored a report in 2016, later published as an article, which concludes that "Where is limited scientific evidence that the triad[4] . . . and therefore its components can be associated with traumatic shaking" and "Where is insufficient scientific evidence on which to assess the diagnostic accuracy of the triad in identifying traumatic shaking." Elinder, G., et al, Traumatic
---------------------------
 
[4] The three symptoms known as "the triad" associated with shaken baby syndrome are retinal hemorrhages, subdural hematoma, and brain swelling. Epps, 474 Mass. at 744.
 -14-
shaking: The role of the triad in medical investigations of suspected traumatic shaking, 107 Acta Paediatr. S472, 3 (2018).[5]
 Indeed, in Middlesex County alone, there have been a number of shaken baby cases in which the District Attorney's Office has appropriately nolle prossequed murder indictments when the medical examiner who conducted the autopsy reconsidered the position that the death was as a result of a homicide after reviewing additional material and determining ultimately that the cause of death was undetermined.[6] It is eerily similar that in this case the medical examiner who performed the autopsy ultimately felt compelled to change her opinion because of grave doubts about the death being the result of abusive head trauma. Her ethically appropriate efforts to change the autopsy report were not honored by the medical examiner, nor, does this Court find, was he required to do so. However, this circumstance provides another indicia of the fragility of the medical conclusions drawn in a case like this, particularly when there is circumstantial evidence, inconsistent evidence, and conflicting evidence weighing against the notion that the defendant in this case harbored the necessary intent or malice to support a second-degree murder verdict.
 In her dissenting opinion to the denial of certiorari in the United States Supreme Court case of Cavazos v. Smith, 565 US 1, 13 (2011), Justice Ginsberg noted:
 
 Doubt has increased in the medical community "over whether infants can be fatally injured through shaking alone." State v. Edmunds, 308 Wis. 2nd 374, 385 (2008). See, e.g., Donohoe, Evidence-Based Medicine and Shaken Baby Syndrome, Part I: Literature Review, 1966-1998, 24 AM. J. Forensic Med. & Pathology 239, 241 (2003) (by the end of 1998, it had become
---------------------------
 
[5] The 2016 Report can be found online at: https://www.sbu.se/en/publications/sbu-assesses/traumatic-shaking--the-role-of-the-triad-in-medical-investigations-of-suspected-traumatic-shaking/.
[6] See, e.g., Commonwealth v. Geoffrey Wilson, Middlesex Superior Court, Criminal No. MICR2010-596.
 -15-
 
apparent that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS," and the "commonly held opinion that the finding of [subdural hemorrhage] and [retinol hemorrhage] in an infant was strong evidence of SBS was unsustainable."); Bandak, Shaking Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms, 151 Forensic Sci. Intl, 71, 78 (2005) ("Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand without injury . . . . [A]n SBS diagnosis in an infant . . . without cervical, spine or brainstem injury is questionable and other causes of the intra-cerebral injury must be considered."); Mins, Shaking Baby Syndrome: Theoretical and Evidential Controversies, 35, J. Royal College of Physicians of Edinburgh, 5, 10 (2005) ("[D]iagnosing 'shaking' as a mechanism of injury . . . is not possible because these are unwitnessed injuries that may be incurred by a whole variety of mechanisms solely or in combination."); Uscinski, Shaking Baby Syndrome: An Odyssey, 46 Neurol. Med. Chir. (Tokyo) 57, 59 (2006) ("[T]he hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy."); Leestma, Case Analysis of the Brain — Injured Admittedly Shaken Infants, 54 cases 1969-2001, 26 Am. J. Forensic Med. and Pathology 199, 211 (2005) ("[M]ost of the pathologies in allegedly shaken babies are due to impact injuries to the head and the body."); Squier Shaken Baby Syndrome: The Quest for Evidence, Fifty Developmental Med. & Child Neurology, 10, 13 (2008) ("[H]ead impacts onto carpeted floors and steps from heights in the one to three feet range result in far greater. . . forces and accelerations than shaking and slamming onto either a sofa or a bed.").
As noted, since this dissenting opinion, and as evident by the testimony presented at the trial of the case at bar, the debate rages on.
 This Court, in its sixteen years as a trial court judge, has never reduced the verdict of a jury in a murder case or in any other criminal case. This stems in large part from the Court's deep respect for the jury system. There is no doubt here that the jury, from this Court's observations, was a serious and attentive group. Nevertheless, from the viewpoint of one who
 -16-
has had occasion, both as a trial lawyer and a judge, to study and consider the probative value of evidence and the credibility of witnesses for decades, this Court is acutely aware of its responsibility to exercise the judgment to reduce a verdict in those rare instances when the verdict rendered is not consonant with justice. Indeed, "[t]he judge's option to reduce a verdict offers a means to rectify a disproportionate verdict, among other reasons, short of granting a new trial." Woodward, 427 Mass. at 667, citing Commonwealth v. Gaulden, 423 Mass. 506, 556 (1996). The Superior Court's power under Rule 25(b)(2), just as the power given to the Supreme Judicial Court under G. L. c. 278, § 33E, "may be used to ameliorate injustice caused by" any of the participants in the criminal process, including the jury. Woodward, 427 Mass. at 667. This Court does not believe that the integrity of a trial by jury is jeopardized if the verdict is reduced in this case. Rather, such a reduction ensures that an injustice is not done.
ORDER
 Based on the foregoing, it is hereby ORDERED that the defendant's request for post-conviction relief in the form of either a new trial or the entry of a verdict of not guilty is DENIED. The Court further finds and hereby ORDERS that the verdict of guilty of murder in the second degree be set aside, and that a finding of guilty of involuntary manslaughter be entered. The Clerk is ORDERED to set a hearing for resentencing of the defendant on the lesser offense.
@/s/Kenneth J. Fishman Justice of the Superior Court
@August 19, 2019
 -17-
xxz